First case on today's docket is in the matter of the estate of Lolita Ledbetter versus Dana Jean Stephens, executor in Alberta, Stephens individually. And we have today John Long arguing for the appellant and Arlene Traubauer for the appellate. You may proceed, Mr. Long. Thank you, Your Honor. I would like to speak first and principally about the largest asset that was involved in this case. And that was a $10,000 certificate of deposit at Union Planners Bank, which later became Regents Bank, in Sparta, Illinois, that was held jointly by Lolita Ledbetter, the decedent, and her son, Howard Ledbetter, now just referred to him as Howard, and encouraged Lolita throughout the visit. Lolita, in the company of Alberta, closed out that certificate of deposit on July 28, 2003, and she withdrew $9,798.23 and on the same day opened a new joint tenancy account in which Lolita named Alberta as the joint tenant. Lolita and Alberta signed the bank signature card for the new account in accordance with Section 2A of the joint tenancy. And the Petitioner's Exhibit, that Star's Exhibit 14, contains both a copy of the CD that was cashed out and a copy of the bank signature card that was signed by Lolita and Alberta. Under the Illinois Supreme Court's decision in Merchants v. Grants v. Crust & Savings Bank, the bank signature card presumably spoke the whole truth, and in order to go behind the terms of that agreement, one challenging it, namely Howard, in this case, had the burden of proving by clear and convincing evidence that Lolita had not thereby intended a gift to Alberta. Now, that creates a strong presumption in favor of the validity of the gift. There's another presumption that arises in this case if a fiduciary relationship exists between Alberta and Lolita. In a sense, there's a possibility of competing presumptions. The Appellate Court for the 1st District discussed this conflict of these presumptions in a case cited in the answer brief. It was the In Re Estate of T.O.T.E.H.L.L.S., a 2002 case. And in that decision, the Appellate Court for the 2nd District said that if the fiduciary relationship arose after the joint account was created, then you basically ignored the fiduciary relationship. In other words, the presumption described by the Illinois Supreme Court in Merchants v. Grants v. Crust & Savings Bank controlled the outcome, the presumption in favor of the gift. On the other hand, if the fiduciary relationship arose before the joint tenancy was created and was thereby created by the exercise of the fiduciary's power and influence over the principal, then the second presumption, the presumption that there's fraud if the fiduciary benefits from a transaction in which the fiduciary engages, that presumption controls. So in order to figure out which of these presumptions should control, even if there was a fiduciary relationship between Elita and Alberta, which we did not see, it's necessary to look at the evidence as to when the fiduciary relation arose, if at all. So in other words, the time preceding July 28th of 2003 is crucial. It's in that time period that evidence must be found or must be produced by the court in this case in order to demonstrate that there was, in fact, a fiduciary relationship. Now, as to what must be done by Howard to prove that there was such a fiduciary relationship, he has to show more than just a blood relationship. He has to show more than the fact that – well, let me back up for a second. Under some circumstances, a fiduciary relationship exists as a matter of law. For example, if there was a power of attorney for property made by Elita in favor of Alberta, that would be a fiduciary relationship as a matter of law. There was no power of attorney for property in this case. There was a power of attorney for health care. It's not exactly clear when that was executed, but it is clear that it was only for health care, and Alberta testified that she relied on that only – I think she said in her testimony only once during the last week of Elita's life, which would have been in the first part of October of 2004, which is more than a year later than July 28, 2003. But if the court will look at the record and analyze it de novo, as it should do under the Illinois Supreme Court's case in Edison Insurance Company v. Faith, because this was all documentary evidence in front of Judge Batka. He didn't hear a single witness. So the court – this court is free to look at the record and to draw some conclusions as Judge Batka was. If the court will look at the record and see what's in there with respect to what transpired before July 28, 2003, there is nothing to indicate that Alberta gave advice and counsel to Elita about business matters or that Elita relied on her advice and counsel. Another way of approaching that is to say that there's nothing that shows that Alberta exercised dominion over Alberta with respect to financial or business matters or that Alberta had influence over Elita concerning any financial matters. In the absence of that sort of advice and counsel proceeding from Alberta toward Elita and Elita accepting and following that advice and counsel, there is no fiduciary relationship. There are several Illinois Supreme Court cases which we cited. One is Apple v. Apple. Another one is Latimer v. Perry. Another one is Morris v. Peterson, all of them, as I said, which we cited in three, which say that in order to demonstrate the existence of a fiduciary relationship, the person claiming that such a relationship exists must show by evidence that it's clear, convincing, unmistakable, and that leads to but one conclusion, namely that there was indeed a fiduciary relationship. That evidence is simply not present in this record. And it's especially not present in the record as it pertains to the events up to July 28, the date that the CD was cashed out. All that we have in the record is the fact that Alberta took care of her mother because she lived across the road from her. Alberta was and is an LPN, and so she cared for her mother. She did write checks for her mother because her mother at one point was asking other people to sign her checks for her and it wasn't in Chester, I think it was Evansville that said that that can't go on. Somebody's got to take that charge and not let other people sign checks for her. So there's evidence that Alberta did sign checks for her, but that's not enough to show a fiduciary relationship. There's a case that we cited in the matter of the estate of Shetland, which specifically addresses that question. Signing checks without the evidence of more is not enough to show that there is a fiduciary relationship. So far from not being enough to show by clear and convincing evidence and unmistakably that there was a fiduciary relationship, there's not even enough to show by preponderance of the evidence that there was a fiduciary relationship as of July 28th of 2003. Because of that, when Eulita cashed out that CD and put Alberta's name on the joint tenancy account and when Eulita and Alberta signed the bank signature card, the presumption that the Omaha Supreme Court discussed of merging versus Granite City Trust and Savings Bank arose, namely that the bank signature card is presumed to speak the whole truth and it's presumed that Eulita intended a gift to Alberta and in order for the person challenging those conclusions or that presumption to succeed, he must demonstrate by clear and convincing evidence that a gift was not intended. And far from showing that there's any reason to believe that a gift was not intended, there was actually evidence in the record showing why Alberta may have chosen to do this at that particular time. And that evidence concerns land that Alberta owned. She lived on a farm, had lived there since 1941 and after her husband's death in, I forget when it was, it was 21 years before, I think it was 83, there were three deeds that she had made that gave each of her children, Alberta, Howard and Gene, one-third of the acreage of the farm. And at some point, the son, Howard, made an effort to persuade his mother to change the deeds, the way he put it, he testified about this, the way he put it, was that he wanted the deeds to be done properly. Willie also admitted that the acreage was equal. I think what perhaps seemed improper to him was the fact that the house was on the four acres that Alberta was to get. And Alberta testified that this was without objection on her savings, is that Eulita had indicated to her that he should have the whole farm because he was the only son, the only person who had the better name. Now, Howard did deny that he tried to get the whole farm, but he admitted that he had talked to his mother about doing different deeds and he had even tried to take her to a lawyer in Chester, a gentleman named Ronnie Arbiter, to have those deeds done differently. Well, that turned out badly for Howard because Eulita became upset with him. He even acknowledged that she had become upset. He said that he thought that she had gotten over being angry, but Alberta testified that about the same time was when this trip to the bank occurred and the cashing out of the CD and the opening up of the new joint tenancy account on which Alberta was the joint tenant. So, not only was there no evidence that Alberta was a fiduciary as of July 23, 2003, or that she had in any way abused a non-existent fiduciary relationship, there was evidence indicating a reason why Eulita might have decided to cash out the CD and take Howard's name off of it by cashing it out and by opening up a new account on which Alberta was the joint tenant. Now, if the presumption in merging is considered to apply here, then whatever happened with that account after it was opened, that cannot be any evidence of either the existence of a fiduciary relationship or the abuse of a fiduciary relationship because that was Alberta's money. I mean, the law that applies to a joint tenancy account is that either joint tenant is free to withdraw the money. I mean, there may be some situations where if you word it a certain way that that can't be done. It might take the signature of both, but my understanding with respect to this account was that Alberta was free to withdraw all of it for herself if she chose to do so. Now, there was a $7,500 check written on that day to Alberta. Alberta testified that even though it was written to her that the money went to her mother and she did not know what Eulita had done with the money, but even if all of it had been cashed out by Alberta and used by her, that was her money to use. As I said before, that would not have been an indication of either the existence of a fiduciary relationship or her somehow misusing a fiduciary relationship. And if the court looks at the evidence in the record beyond July 20, 2003, it's essentially more of the same. Alberta taking care of her mother physically, using her abilities as a nurse, writing checks out for her because of some difficulty that she had writing out checks, but not giving her advice and counsel, not dominating, not influencing her. In fact, there are three people that testified about how, well, not just difficult, but absolutely impossible it was to influence Eulita. Her friend Kay Kempfer said that, I think she said she was a headstrong woman, if you know what I mean. And then Alberta testified that you could not, she said to ask her mother that Eulita did what she wanted, when she wanted, if she wanted, you could not influence that woman. And Dana, Alberta's son and Eulita's grandson, testified that she was, I forget how he put it exactly, but he didn't say close with the dollar, but determined that nobody would take advantage of her with respect to the dollar she had. So that's what's in the record, that she was very difficult to influence. In fact, that's demonstrated also by the absolute failure that Howard had when he tried to persuade his mother to redo the deeds that had been in existence for 20 years. Just to make one point clear, the deeds were written in 83, but they weren't recorded to the end of May and the beginning of June of 2004. I'm not sure exactly why they were kept that long, but apparently the entire family knew that the deeds were there, dividing it up one third, one third, one third. And for whatever reason, Howard talked to his mother and he absolutely failed to change her mind. So the one clear evidence we have in the record of somebody trying to influence Eulita with respect to the disposition of her property was an action by Howard and it was unsuccessful. And there is no evidence that Eulita did anything other than what she wanted to do. There's no evidence that Alberta influenced Eulita in any way. So I'm repeating myself, but not only was there not clear and convincing evidence that a fiduciary relationship existed, there wasn't even evidence beyond a preponderance to demonstrate that there was such a fiduciary relationship. Now there were other gifts that were made by Eulita. I would guess that altogether they probably didn't equal in value the $10,000, but there was about 14 different items. Some of those items were in the possession. One was in the possession of Alberta's husband, Hyde, that was a power-lifting chair. Two were in the possession of her daughter, Eulita Setsko, a Shakespearean clock, which I don't know what that is, I'd kind of like to see what a Shakespearean clock is, and some oak kitchen chairs. Those people weren't joined as defendants and a basic rule of law is that they were necessary parties in order for the court to presume to rule on their right to possess those items. So I do not see how the court's ruling with respect to the items possessed by Clyde or Julie can stand because the necessary parties were not in this case, and I think that part of it at the least, that part of the court's order at the least has to be reversed. Other items also were a bed that Eulita had given to Alberta, and there was another small item, an alabaster picture frame. There was evidence in the record, well there was Alberta's testimony, and for most of these items there was also Dana's testimony, that Eulita had indicated that she had intended to make, had made, a gift of those items to the people who possessed them. So there's really no evidence that she didn't intend to make those gifts, and these were the sorts of things, I mean these were not, the biggest thing was this antique bed, and who knows what that was worth, there was really not any, I don't think there was any testimony as to what that was worth. There was a power lift chair that Clyde got, there was evidence that Eulita didn't even like it and wanted to get rid of it. So there's evidence in the record that she did make a gift, she parted with the possession of the items during her life, and so there's no reason for the court to have said that those didn't constitute gifts. Now I'd like to speak also about some of what I consider to be strange features of the court's order. For one thing, the worst part about it I think is throwing in this provision that Alberta and Dana should pay $1,000. You'll have the opportunity, Mr. Long to rebuttal. Thank you. Thank you. Mr. Trauber. Please support Mr. Long. My name is Harley Trauber, I represent the L.A. James Haught Ledbetter. I'd first like to address the issue of fiduciary relationship in this case, and I think this case is a little unusual because it's up on appeal for the second time. Judge Brandon heard all the evidence originally in the case. He basically ruled in favor of Mr. Ledbetter didn't mind a fiduciary relationship. That case was appealed, and the appellate court remanded that case on the issue concerning the Dead Man's Act. The appellate court didn't address the other issues. When that case came back to Randolph County, Judge Babka was sitting at that time, and Judge Babka ruled in the case. The party stipulated that he could look at all of the exhibits, the depositions, the transcript, and there was no actual live testimony taken from Judge Babka. As counsel stated, I think the court has the opportunity to look at the evidence they know of, but it is unusual. Unlike the cases cited in the appellate's brief where the trial court heard the case one time and just listed the depositions, we do have one judge who heard this entire case and decided in the appellate's favor. At first, another judge certainly would give some credence to the first judge's ruling. That's an interesting proposition, but have you ever seen a case that said that? Well, Judge, I've looked, and I haven't. It's a very unique situation, and I frankly could not find a case with those set of facts. Okay. With regards to the fiduciary relationship, I think there was ample evidence that there was a fiduciary relationship here. This lady was 91 years old, by some accounts was blind or nearly blind. A witness, Kate Kempford, testified that, cited in the appellate's brief, that she was doing pretty well during the last 10 years of her life, except that for the last four or five years, her eyesight went down quite a bit, and she became blind. In the last three years of her life, she did not make sense all the time. That is, she would say different things about something and then forget that she had even said them. The decedent's daughter, I've heard, had lived across the road from her, basically from her testimony, saw her daily and weekly occurrence, took care of a lot of her physical needs, helped her pay her bills, took her to the doctor. She had the health care card occurring. So I think there was ample evidence that there was a fiduciary relationship between Alberta and her mother. So there was also ample evidence that the decedent wanted to treat her children equally. She had three children, Alberta, Jean, and Howard. There was testimony that she had three CDs in the amount of $10,000. She had a CD for Alberta, she had a CD for Jean, and she had a CD for Howard. Well, at one point, she did cash in the $10,000 CD for her daughter, Jean, and when she made a rewrote of her will in May of 2003, she specifically bequeathed $10,000 to that daughter, Jean, whose CD had been cashed in. So there was ample evidence that she wanted to treat these children equally. Now, what did Alberta do in this case? She, as stated, she took her mother to the bank, had her cash in the CD for Howard, and she opens up a joint check-in account with her and her mother, deposits that $10,000 after taking a penalty. And there was no evidence in this case why this lady, who had assets, had a farm, why she would cash in a $10,000 CD and take a penalty. She cashes that in, and after the penalty, deposits about $9,300 in this check-in account, and then a check is written out to Alberta in the amount of $7,500. There was testimony at the trial that that signature line on that check did not come close to matching Eulita's signature. In addition, although Alberta testified, she didn't know what happened to that $7,500. There was no evidence that it went to anybody other than Alberta. There's no evidence that it went to Eulita, that it was used to pay bills, et cetera. So I think that was an obvious breach of the fiduciary relationship. I have a question with respect to what you said earlier about evidence of wanting to treat the children equally. Was there any evidence as to what the realty was worth on the piece of property that Alberta was pleased? I don't believe there was any testimony as to the value of the real estate. There was some testimony of Mr. Lett that had been somewhat upset about how it was provided, and I think the reason for that was that the home, the house itself, went on the real estate that went to Alberta. And my point is that would generally increase the value of that piece of real estate possibly very considerably. Correct. So that might be an indication that she didn't intend to equally bequeath the property money to the children. Well, again, there was no testimony concerning that. As Mr. Long said, the deeds were done long before the actual deeds were recorded. But I don't believe the record has any indication as to the various values of those pieces of real estate. Were they the same size generally? I think approximately the same acreage. The court, of course, decided that the $10,000 should be returned to Mr. Lettbetter. There was some argument in the adults' brief that this was improper. But I think that involves a very narrow reading of the citation statute. Certainly under the citation statute, the court has the authority. And I would quote what that statute says. So I think the court had the authority in this proceeding to require that Alberta pay the $10,000 back to Mr. Lettbetter. I would also cite this court's case, the estate of Lewis Miller, which was decided in 2002, a case out of Randolph County, where the exact same thing occurred, where there was joint CDs that were improperly transferred. The court ordered the CD to be returned to the petitioner. Which case was that? I apologize. That is Henry, the estate of Lewis Miller. It's 268, Illinois Decisions, 276, cited in 2002. One additional fact about that is that when Judge Bapka entered an order in this case on January 13th, the parties were before the court after this court had ruled in the earlier case. And asked both parties to submit briefs within 60 days. And specifically said that the parties agreed with this court's order that the foregoing is contingent upon Alberta Stevens' agreement to be bound by the rulings in this matter, which agreement shall be filed with the court within 10 days. Thereafter, Alberta Stevens, in her appearance in the case, agreed to be bound by whatever orders that the court entered. So I think it was proper to enter the order that the court did against her. Were you proceeding against Alberta on a tort theory of tortious interference with expectancy, or were you proceeding under the citation statute? I think, Judge, I didn't try the case, Judge, but I think they were proceeding under the citation theory, a turnover theory. Now they're stating that they didn't plead everything that was necessary, but if you look at the citation act, I think they proceeded properly. I think the court had the authority to enter the order that it did. At the end of the petitioner's evidence, the petitioner asked that the pleadings conform to the proof that was presented in the case, and the judge entered an order saying that the pleadings would conform to the proof. So I think there was evidence that there was a fiduciary relationship, that this lady took her mother to the bank, cashed in the CD that was in Howard's name, and then basically took that money. So I think under the citation statute, the court had the authority to enter the order that it did. But to enter a personal judgment against somebody else and not in favor of the estate. Right. And I think that's what happened in the other case cited in the Fifth District, that if you look at the statute, it's a very broad statute. It allows the court to enter orders to determine the title to property, so it's not unusual that that would occur in this case. But doesn't that allow people to move ahead, potentially, of other people in the will? Exactly. Exactly. And I think that's, if you look at the case cited previously in the Fifth District, that's exactly what happened. There was a joint tenancy account. There's a citation filed against the person that took that account, and the court said, you have to pay it back. And if you look at the statute, I think it specifically authorizes that. In Section D, the court can determine all questions of title, claims of adverse title, and the right of property. It may enter such orders as the case requires. So it is a very broad statute, and I think it permits these type of actions and it permits personal judgments. What about the propriety of entering an order requiring the return of property that wasn't even in the possession of Alberta? Yeah, I think, Judge, that's a close question. What happened here, you have to look at the facts in this case. There was testimony that these items were in the home of the decedent shortly before she died. The executor in this case was Alberta Stevens' son. The two other people that got this property that didn't appear, that weren't named in the citation, were Alberta's husband and Alberta's daughter. So I think what the court was saying, under these set of circumstances, the executor had a duty to look into this and to collect these items of property for the estate. Now, if you look carefully at the order that was entered, the judge directed the executor, Dana Stevens, to retrieve the following items of personal property. So I guess it would still be open for the executor to come in and say, I can't do it. Then the court would have to make a decision, I think, what to do at that point. But I think, certainly under these circumstances, the executor had the duty to look into these transfers. It was his father and his sister. And they'd even call these people and say, what are the circumstances? You're the donee. You have some obligation here to tell us what happened. Could they have been made parties? I guess so. I'm not sure it would make any difference in this case. If I could, on this Henry, the estate of Miller, it's got special administrator of testator filed petition for citation against sister and relative to collect assets for the estate. To collect assets for the estate. He used a citation to collect assets for the estate. That's what it says, Judge. But if you look at the actual decision in that case. Where are you looking at? I'm looking at my page five. It's right before the analysis. So the court found fraud in the transfers of the six CDs and had been held in joint tenancy between Lewis Miller and Albert Miller. And the transfer of CDs that Lewis Miller held as trustee for Albert Miller. The court found equity required. The money from those transfers should not be returned to the estate, but should be the personal property of Albert Miller. The court, therefore, ordered that a judgment be entered in favor of Albert Miller and against him for an amount of $80,301. Okay. Well, basically, in summary, I think there was a fiduciary relationship that was approved in this case. Two judges basically ruled here. I think Judge Babka, someone who was acting as a reviewing court somehow because he didn't hear any live testimony. But he certainly heard oral argument. He looked at all of the record. And I think for those facts that the judgment of the trial court should be approved. Thank you, Mr. Traubert. Mr. Montier for both. Thank you, Your Honor. Your Honor, what Mr. Traubert said about this court's decision in reinstating Miller is correct. There was, frankly, I was surprised to see that in there. It's kind of, it's not hidden, but I mean it's not exactly, it jumps out, it doesn't jump out at you in the head notes. But that case is an outlier, you might say. Because there are cases from the other districts, which here's the most recent is Enright Estate Abuses, YUCIS. The core purpose of Section 16-1 is to recover property that is identifiably that of the estate. And then Enright Estate of Pinkhart, that's 1st District, 1980. The citation proceeding brought pursuant to Section 16-1 of the Probate Act is a special statutory proceeding that can be used for limited purposes. And it cites the purpose of being, recovery of the assets belonging to the estate. What page are you reading from? This is, well, it's Enright Estate of Pinkhart. I'm reading from that case. I can give you the site. Here it is, it's 417 Northeastern 2nd, 1360. And then in the same area, this is on pages 31 and 33. I cite, in a matter of the state of Pinkhart, Enright Estate of YUCIS, in a matter of the state of Hauser. Those cases from other districts do indicate that Section 16-1 is used to recover assets for the estate. You know, one possibility here, and this is not what should be done here. If it's going to be used to recover assets for the estate, if there was a question at all about that $10,000 CD, that should be, and there's not, but that should be recovered for the estate, not just handed over to Enright. And then administered as part of the estate. That would be consistent with the purpose of 16-1. If you look at the title of 16-1, it says it's for recovering assets for the estate. If Dana, as the executor, had done here with the assets of the estate, had done what the trial court has ordered him to do, he'd be guilty of his own breach of the fiduciary obligation. Because he would have to decide, well, I'm going to favor Howard, I'm not going to pay these claims first. And I'm not going to worry about paying these two specific legacies. There's a grandson, I can't remember his name, that was entitled to $10,000. There was also $10,000 to Jean Eggemeyer, who, she survived her mother and was an heiress. She was deceased at the time the judgment was entered, but her estate, or her owner, should be entitled to $10,000. And that's the $10,000 that was cashed in and then she was... Yeah, the mother put the provision will for her. So that would have, in essence, put him ahead $10,000 and her. That's true. If there wasn't anything left, you would get nothing. He would have to, Dana, as the executor, would have to ignore the claims. He would have to ignore the specific legacies. He would also have to ignore the requirement in the statute that the residuary legacies share proportionally in the estate. Because one aspect of the order was that Howard gets thus and so, and ignoring the equal right of the residuary legacies, namely Alberta, the other residuary legacies, Alberta, and the deceased sister, Jean. For example, one part of the order said the executor is supposed to collect these assets, sell them at auction, and then give, well, I think it says one-third of the money to Howard. But that puts that ahead of the obligation to pay claims and to pay specific legacies. So from the standpoint of whether the trial court's order complied with Section 18-14 and Section 18-13 of the Probate Act, it obviously does not. There's also, I think it's Section 23-4, I may be getting that wrong, that talks about the fact that the residuary legacies are to be paid ratedly. In other words, no residuary legacy is entitled to get ahead of another. Mr. Long, can I ask you this real quick? Sure. Were you trial counsel? I was not. Why? I mean, you still heard. The second time, I didn't have anything to do with presenting the evidence. I went back down the second time. Okay. I did a trial. Okay. Your analysis of the record, and we haven't gone through the entire record at this point, was there any discussion of tortious interference with inheritance expectancy in the trial court? There was not. There was not. In fact, when I was writing my trial brief, I had the amended petition for a turnover order essentially laying what? Literally laying next to me, and there's nothing in his petition where he asks for that. You know, when you look at his petition, it looks as though he's saying that whatever you collect here comes back to the estate. Now, there is one thing. I mean, it says something about recover the property of the estate or property that rightfully belonged to the two heirs, but it doesn't say anything about spitting that back up, so to speak, to one of the heirs individually. I mean, the petition, the amended petition specifically, to me, it appears to say only that whatever assets are gathered should come back to the estate. It doesn't say anything about favoring one as opposed to the other. Thank you, Mr. Long. Thank you, Mr. Tucker. We'll take the matter under advisement.